**ORIGINAL**

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

Filed at  12:20 P.M

DEPUTY CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| TERRIE BUCKNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION FILE NO. 3:06-CV-79 (CDL) |
| v. | ) |
| | ) |
| CHIEF JIMMY WILLIAMSON, | ) |
| in his official capacity as Chief | ) |
| of the University of Georgia | ) |
| Police Department; DETECTIVE | ) |
| PETER WALLS, DETECTIVE | ) |
| ERIC DELLINGER and | ) |
| KAREN SHETTERLEY, | ) |
| | ) JURY TRIAL DEMANDED |
| Defendants. | ) |

## COMPLAINT

Plaintiff Terrie Buckner brings this action against Defendants Chief Jimmy

Williamson, Detective Peter Walls, Detective Eric Dellinger and Karen Shetterley as

follows:

-1-

## **INTRODUCTION**

1.

This is a civil rights case brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the U.S. Constitution arising from the unlawful arrest, detention and prosecution of Terrie Buckner ["Buckner"] by and through the intentional acts, customs, policies and omissions of the Defendants. Buckner contends that she was subjected to an illegal search and seizure, detention and prosecution for criminal offenses although no reasonable public official could have believed that arguable probable cause existed to justify the actions. Buckner further alleges that certain customs and policies maintained by Chief Jimmy Williamson, as the policy-maker for The University of Georgia Police Department, caused the constitutional violations asserted herein. Buckner seeks equitable relief, monetary damages, attorneys' fees and costs, and a trial by jury.

## JURISDICTION AND VENUE

2.

This Court has original jurisdiction over Buckner's federal civil rights claims

pursuant to 28 U.S.C. §§ 1331 and 1343.

3.

Venue is proper in the Middle District of Georgia – Athens Division pursuant

to 28 U.S.C. § 1391 because Buckner's claims arose in this District.

## PARTIES

4.

Buckner is a citizen of the State of Georgia residing in Gwinnett County,

Georgia.

5.

Defendant Jimmy Williamson ["Williamson"] is a citizen of the State of

Georgia and is subject to the personal jurisdiction of this Court.  He may be

-3-

personally served with the Complaint and summons at University of Georgia Police

Department, 286 Oconee Street, Suite 100, Athens, Georgia 30602.

6.

Defendant Detective Peter Walls ["Walls"] is a citizen of the State of Georgia

and is subject to the personal jurisdiction of this Court. He may be personally served

with the Complaint and summons at  University of Georgia Police Department, 286

Oconee Street, Suite 100, Athens, Georgia 30602.

7.

Defendant Detective Eric Dellinger ["Dellinger"] is a citizen of the State of

Georgia and is subject to the personal jurisdiction of this Court.  He may be

personally served with the Complaint and summons at University of Georgia Police

Department, 286 Oconee Street, Suite 100, Athens, Georgia 30602.

8.

Defendant Karen Shetterley ["Shetterley"] is a citizen of the State of Georgia and is subject to the personal jurisdiction of this Court. She may be personally served with the Complaint and summons at 305 Idylwood Drive, Athens, Georgia, 30605.

## FACTUAL ALLEGATIONS

9.

Buckner was the Project Director for an educational grant program – Advancing Careers Through Education and Training ["ACET"] – from October 1998 to July 2004. ACET was funded by state and federal tax dollars. As the Project Director, Buckner oversaw contracts and projects managed by ACET.

10.

In accordance with established educational grant procedures, ACET had to be administered through an existing educational institution. As with many similar grant programs, The University of Georgia in Athens served as the administrative "home"

-5-

of ACET. The program itself, however, operated from The University of Georgia satellite campus in Lawrenceville, Georgia ["Lawrenceville Campus"].

11.

As Project Director, Buckner worked at the ACET offices on the Lawrenceville Campus, along with Tammy Brookover ["Brookover"] and Trudy Friar ["Friar"].

12.

Buckner, Brookover and Friar all reported to Shetterley, who was a Senior Public Service Associate for the Georgia Center of The University of Georgia and the Principal Investigator for all of the ACET grant contracts.

13.

Pursuant to the written procedures, regulations and policies of The University of Georgia, as well as related State and Federal Regulations, the Principal Investigator for any project, such as those contracted to ACET, bears oversight responsibility for ensuring that all funds and inventory are properly managed, stored, inventoried and accounted for throughout the term of the grant program and at its conclusion.

-6-

14.

Upon information and belief, The University of Georgia routinely failed to properly manage, store, inventory and account for equipment purchased with public funds for the benefit of The University of Georgia's employees and students.

15.

Upon information and belief, University of Georgia employees, including Shetterley, responsible for grant funded programs like ACET, routinely disregarded established written procedures, regulations and policies of The University of Georgia, as well as related State and Federal Regulations, in their day to day management and oversight of grant programs like ACET.

16.

Beginning in 2002, ACET managed a contract ["ACT Contract"] between the Department of Family and Children Services and the Board of Regents, whereby fourteen (14) separate state agencies and private entities attempted to improve the quality of child care services within the state.

17.

The ACT Contract was originally a three year $12.4 Million project, but Governor Sonny Perdue elected to direct the funds for the third year of the ACT Contract away from the Department of Family and Children Services and to the United Way Smart Start Georgia Program ["Smart Start"].

18.

In addition to the ACT Contract, Shetterley, Buckner, Brookover and Friar administered twelve other individual contract programs under the ACET program between October, 2002 and September, 2004.

19.

As Principal Investigator for each and every educational contract implemented through ACET, Shetterley was principally responsible for maintaining an accurate accounting of the budget and inventory for each contract.

-8-

20.

At the conclusion of any ACET contract, Shetterley was required to oversee and conduct a thorough audit and inventory of supplies and equipment purchased through the contract. Failure to conduct such an audit and inventory constitutes a direct violation of established University of Georgia procedures.

21.

As Program Manager, Buckner was responsible for the day to day administration of the various contract programs implemented through the ACET project. Brookover and Friar provided administrative assistance and support to Buckner.

22.

Buckner reported to Shetterley. Buckner relied upon Shetterley to properly direct and oversee the ACET programs, whereas Buckner took responsibility for the day to day management of the ACET programs.

-9-

23.

Despite her direct oversight responsibilities, Shetterley rarely communicated directly with Buckner. Shetterley routinely delegated responsibilities for such communications to her administrative assistant.

24.

In August 2003, after the Governor announced his decision to divert the ACT Contract funds, Shetterley instructed Buckner and Brookover to spend the remaining funds allocated to the ACT Contract by purchasing a year's worth of office supplies and replacement items.

25.

Buckner and Brookover complied with Shetterley's instructions and purchased thousands of dollars of equipment and supplies.

26.

When the ACT Contract terminated on October 31, 2003, the unused equipment and supplies remained stored at the ACET office on the Lawrenceville Campus.

27.

Two months later, Shetterley advised Buckner that The University of Georgia would no longer submit proposals on behalf of the ACET and would not renew the office lease after June, 2004.

28.

Shetterley effectively disowned the ACET program even though The University of Georgia remained the administrative home of the program and Shetterley remained directly responsible for ensuring that monies, equipment and supplies purchased through the ACET program were properly accounted for, stored and inventoried.

29.

Sharon Hausmann ["Hausmann"] was the Smart Start Program Director.

Pursuant to the Governor's decision to direct ACT Contract funds to the Smart Start

Program, Hausmann knew that her program should inherit any equipment, supplies

or other inventory purchased with Smart Start contract monies.

30.

Hausmann requested that Shetterley return existing Smart Start contract

inventory.

31.

Shetterley falsely claimed to have conducted an inventory of the supplies,

equipment and furniture at the ACET office on the Lawrenceville Campus in March,

2004.

32.

Shetterley never conducted the inventory. Shetterly instead replied by sending

Hausmann an ad hoc list of furniture and computer equipment purportedly purchased

-12-

by the Smart Start ACT contract, including one hundred and fifteen thousand dollars ($115,000.00) worth of items that were not actually paid for with Smart Start funds.

33.

Buckner informed Shetterley that much of the furniture and equipment on the list was not paid for with Smart Start funds before the items were sent to Smart Start. Shetterley did not change the list, so Buckner followed Shetterley's instructions and insured that all the furniture and computer equipment on Shetterly's ad hoc list was sent to Hausmann at Smart Start.

34.

Shetterley informed Buckner that the Smart Start Program would have to pay to move the ACT Contract inventory as The University of Georgia did not intend to pay for moving any of the inventory at the ACET's offices.

-13-

35.

On June 30, 2004, Smart Start sent movers to the ACET offices. The Smart Start movers moved some, but not all of the equipment from the ACET's offices to Smart Start's office.

36.

As the lease expiration date of June 30, 2004 approached for the ACET offices, Buckner, Brookover and Friar repeatedly informed Shetterley's office that a significant amount of equipment and supplies remained at the ACET offices. Shetterley did not respond to them.

37.

Shetterley told Buckner, Brookover and Friar that The University of Georgia would not pay to move the remaining equipment and supplies, and would not store the remaining equipment and supplies at any of its locations after the lease expired on June 30, 2004. Shetterley's administrative assistant had directed Brookover to stop sending supplies and equipment to Athens as they were out of space.

38.

Shetterley did not come to the ACET offices on the Lawrenceville Campus

when Buckner, Brookover and Friar arrived to box up the equipment and supplies,

so the ACET program could vacate premises before expiration of the lease on June

30, 2004.

39.

Without any direction from the Principal Investigator, Shetterley, Buckner,

Brookover and Friar did not know what to do about the remaining inventory.

Buckner, Bookover and Friar knew the inventory had been purchased with public

funds. They considered themselves responsible for protecting the inventory and

ensuring that it ended up being properly transferred to the new office locations of the

ACET program.

40.

On the day of the move, Buckner, Brookover and Friar elected to pack up the

remaining inventory and store it at their homes for safe keeping. Buckner, Brookover

-15-

and Friar knew that the remaining inventory would likely be assigned to the ACET

Training for the Trainer's Program, which was relocating to the Georgia Association

on Young Children offices in Atlanta as soon as the pending proposal was funded by

the Georgia Child Care Council.

41.

Buckner's home was much larger than Brookover and Friar's residences.

Buckner's home was also closer to the Lawrenceville Campus. Solely for these

practical reasons, Buckner, Brookover and Friar moved the vast majority of the

remaining inventory to Buckner's garage.

42.

Shetterley was aware that Buckner, Brookover and Friar were storing the

surplus inventory at their homes. Shetterley knew that she had left Buckner,

Brookover and Friar with no other choice as Shetterley refused to assist with the

move and refused to store the surplus inventory at The University of Georgia.

-16-

43.

Shetterley further instructed ACET staff members, including Buckner, to work

from home for a period of three months from July until September 30, 2004 when the

terms of the remaining ACET contracts expired.  However, Shetterley did not follow

strict University of Georgia policy requiring authorization for the use of this property

to non University of Georgia locations.

44.

As Project Director, Buckner was to oversee completion of the deliverables

and complete the final reports.  In addition, Buckner and Friar were to conduct the

last training program under the ACET contract.  Brookover was supposed to oversee

the bookkeeping and accounting for the contract.

45.

On July 1, 2004, Buckner became grants manager for the Georgia Department

of Technical and Adult Education ["GDTAE"].

-17-

46.

After she became the GDTAE grants manager, Buckner continued to work with

Brookover and Friar as they wound up the remaining ACET contracts.

47.

On August 4, 2004, a confidential informant, believed to be Susan Nemec,

called University of Georgia police and reported that Brookover, Friar and Buckner

were selling school property on E-Bay's website.

48.

Eric Dellinger ["Dellinger"] and Peter Walls ["Walls"], officers with the

University of Georgia Police Department ["UGA Police"] were assigned to

investigate the allegation.

49.

Upon information and belief, Dellinger and Walls had little to no training or

experience investigating an alleged felony theft of thousands of dollars of equipment

from The University of Georgia.

-18-

50.

Upon information and belief, Chief Jimmy Williamson ["Chief Williamson"] does not require that employees of the UGA Police like Dellinger and Walls attend training courses, receive on the job instruction from qualified senior officers, or otherwise receive the kind of training and experience typically held by officers in law enforcement agencies charged with conducting a major felony theft investigation.

51.

Upon information and belief, UGA Police, by and through the acts and omissions of Chief Williamson, has maintained a custom of instituting formal criminal investigations based solely upon the word of a tipster or confidential informant without first taking any objective steps to determine whether the tipster or confidential informant is reliable.

52.

Upon information and belief, UGA police, by and through the acts and

-19-

omissions of Chief Williamson, has maintained a custom of pursuing criminal investigations beyond the designated jurisdictional limitations placed upon the UGA police including attempting to conduct searches, interview suspects, and seize evidence outside their geographical jurisdiction.

53.

Upon information and belief, UGA police, by and through the acts and omissions of Chief Williamson, has maintained a custom of pursuing one sided investigations that routinely ignore readily available evidence that would tend to point to the innocence of the subjects of such investigations and, following an arrest based solely upon such investigations, said subjects have been fully exonerated of any criminal wrong-doing.

54.

When Dellinger and Walls began their investigation, a minimal inquiry into the identity, background and motivation of the confidential informant – the kind of inquiry that is routinely performed as a matter of course by law enforcement officers

-20-

in agencies throughout Georgia – would have established a personal bias, lack of credibility, and lack of personal knowledge that would have caused any objectively reasonable officer to limit the scope of any further investigation.

55.

Dellinger and Walls conducted no such inquiry into the identity, background and motivation of the confidential informant. Dellinger and Walls accepted the information as truthful and instituted a campus-wide investigation to uncover the whereabouts of the allegedly misplaced and unaccounted for inventory.

56.

Dellinger and Walls interviewed Shetterley. Shetterley lied to Dellinger and Walls concerning her prior knowledge of the whereabouts of the surplus inventory from the ACET offices. Shetterley again claimed to have conducted an inventory of the equipment and supplies at the ACET offices although no such inventory had taken place. Shetterley claimed to be unaware that Buckner, Brookover and Friar had stored surplus equipment and supplies in their homes for safe-keeping.

-21-

57.

Shetterley also failed to inform Dellinger and Walls that Buckner was still involved in wrapping up the ACET contracts. Shetterley did not inform Dellinger and Walls that she had authorized Buckner to assist Brookover and Friar as they wrapped up the remaining ACET contracts.

58.

Unbeknownst to Buckner, on August, 24, 2004, Brookover briefly listed certain equipment she had stored at her home on E-Bay's Website. On August 26, 2004, Dellinger, Walls and Shetterley went to Brookover's home and confronted her concerning the E-Bay Website listing. Brookover admitted to listing the equipment on August 24, 2004.

59.

Dellinger and Walls knew that their geographical jurisdiction ended five hundred (500) feet from The University of Georgia campus in Athens, Georgia but, consistent with the customs of the UGA Police described herein at ¶¶ 49-53,

-22-

Dellinger and Walls nevertheless arrived at the Brookover home without first requesting assistance from a law enforcement agency with jurisdiction in Brookover's county of residence.

60.

Brookover told Dellinger, Walls and Shetterley that the majority of the surplus equipment was stored at Buckner's residence. Although Shetterley was fully aware of this fact, she did not inform Dellinger and Walls that she had previously approved storage of the surplus equipment at Buckner's residence.

61.

Brookover told Dellinger, Walls and Shetterley that Buckner did not know she had listed the equipment on E-Bay's website. Brookover did not give Dellinger, Walls and Shetterley any information implicating Buckner in any way in a scheme to steal surplus equipment and supplies from the ACET offices. To the contrary, Brookover informed them via e-mail that Buckner and Friar had no knowledge of her actions.

-23-

62.

Dellinger and Walls had no evidence, other than the presence of the surplus equipment at the Buckner residence, that would lead an objectively reasonable law enforcement officer to believe that Buckner intended to steal any of the surplus equipment at her home.

63.

The following day, Dellinger and Walls arrived at the Buckner's home in Gwinnett County. Jerry Buckner, Buckner's husband, answered the door. Dellinger and Walls demanded that they be allowed to enter the residence to search for the surplus inventory.

64.

Jerry Buckner refused to grant them entry into the Buckner residence without a search warrant. Dellinger called Buckner at work and demanded that she give them permission to enter her home.

65.

Buckner initially refused to allow them to enter her home without a search warrant, however she left work to return home to meet Dellinger and Walls.

66.

Dellinger and Walls became belligerent and threatening with Jerry Buckner when he refused to allow them to enter the Buckner residence without a search warrant. Dellinger and Walls walked around the Buckner residence and looked inside the garage windows where the surplus equipment stored.

67.

When Buckner returned home, Dellinger or Walls informed her that she was under investigation for purchasing items with government funds for the purpose of selling them for her own financial gain.

68.

Buckner immediately and unequivocally denied the allegations. Buckner gave Dellinger and Walls necessary information establishing her innocence. Buckner then

-25-

immediately returned all of the ACET items that could be easily retrieved from her home to Dellinger and Walls.

69.

Dellinger and Walls knew that their geographical jurisdiction ended five hundred (500) feet from The University of Georgia campus in Athens, Georgia but, consistent with the customs of the UGA Police described herein at ¶¶ 49-53, Dellinger and Walls came to the Buckner's home without first requesting and receiving assistance from the Gwinnett County Police Department and/or the Gwinnett County Sheriff's Department.

70.

Buckner sent an e-mail to Shetterley regarding the investigation and the police officers who had appeared at her residence. Buckner told Shetterley what she already knew or should have known, particularly that Buckner had only stored the surplus inventory at her home because there was no were else to put it and that Buckner had never attempted to sell or keep any of the items. Buckner further requested that The

-26-

University of Georgia immediately make arrangements to retrieve the remaining ACET items.

71.

Shetterley did not respond to Buckner's e-mail.

72.

With Buckner's permission, the remaining items were removed from her home on August 31, 2004 by the ACET, Georgia Center accountant.

73.

On September 1, 2004, Buckner sent another e-mail to Shetterley reminding her of ACET grand funding streams, which Shetterley frequently confused. Shetterley again failed to respond.

74.

Dellinger and Walls did not make any effort to collect readily available documentary evidence tending to establish Buckner's innocence, including various e-mail communications prior to the June 30, 2004 move from the ACET office on the

-27-

Lawrenceville Campus establishing Shetterley's prior knowledge and approval of

Buckner's actions in storing the surplus inventory at her residence for safe keeping.

75.

Dellinger and Walls did not follow up on any of the information provided to

them by Brookover, Friar or Buckner that directly contradicted Shetterley's

statements and tended to establish Buckner's innocence.

76.

Dellinger and Walls ignored other evidence, including Buckner's prior request for

postage and packaging materials to Shetterley and Brookover, that tended to establish

Buckner's innocence.

77.

Intentionally ignoring this and other evidence establishing Buckner's

innocence and a lack of probable cause, Walls completed an incident report alleging

that Buckner had committed ten (10) counts of Felony Theft by Taking.

-28-

78.

Dellinger was Walls' immediate supervisor. Based upon all the facts and circumstances Dellinger in fact knew, or should have known had he and Walls conducted a competent investigation, Dellinger knew that no probable cause existed to support the charges of Felony Theft by Taking against Buckner.

79.

Dellinger also participated directly in the one-sided investigation summarized by Walls in his incident report.

80.

Dellinger approved Walls' Incident Report, thereby authorizing Walls to seek an arrest warrant for Buckner.

81.

On September 13, 2004, Walls appeared before a Magistrate Judge and swore out an arrest warrant against Buckner.

82.

An objectively reasonable officer in Walls' position would have known that, under the totality of the circumstances, no probable cause existed to support an arrest warrant against Buckner.

83.

When Buckner learned of the warrant, she immediately turned herself into the Gwinnett County Sheriff's Office.  She remained incarcerated until she made her bond.

84.

Buckner's arrest was widely publicized.  With the prior assistance and knowledge of Shetterely, Dellinger and Walls, a spokesman for The University of Georgia made a statement to the press claiming that Buckner had intentionally stolen the surplus equipment from the ACET program.  At the time the statement was made, Shetterley, Dellinger and Walls knew or should have known that it was untrue and constituted defamation per se.

-30-

85.

As a direct result of her arrest and the publicity that surrounded her arrest,

Buckner was terminated from her position with GDTAE on November 8, 2004.

86.

As a direct result of her arrest and the publicity that surrounded her arrest,

Buckner lost her position at Shorter College.

87.

As Buckner has spent her entire career working in positions of public trust in

academic settings, her arrest and the publicity that surrounded her arrest effectively

destroyed her career in public service.

88.

The Gwinnett County District Attorney's Office ["Gwinnett DA"] was the

prosecuting authority for Buckner's case.    The Gwinnett DA conducted an

independent investigation of the charges to ascertain whether the evidence was

sufficient to submit the case to the Grant Jury.

-31-

89.

The Gwinnett DA considered evidence that had been readily available to, but

was ignored by Dellinger and Walls that established Buckner's innocence.  The

Gwinnett DA dismissed the charges against Buckner without submitting them to the

Grand Jury because the totality of the evidence did not warrant prosecution.

## COUNT I
## FOURTH AMENDMENT – 42 U.S.C. §1983
### (False Arrest)

90.

The foregoing paragraphs are incorporated herein by this reference.

91.

As fully described herein in the proceeding paragraphs, the Defendants acts,

omissions, policies and customs resulted in Buckner's arrest and seizure, thereby

depriving her of her liberty in violation the Fourth Amendment of the United States

Constitution.

-32-

92.

Under the facts and circumstances alleged herein, an objectively reasonable

public official in Shetterly's position would have known that offering intentionally

misleading and incomplete information falsely implicating Buckner in criminal

activity would cause Buckner to be seized and deprived of her liberty in violation of

the Fourth Amendment of the United States Constitution.

93.

Under the facts and circumstances alleged herein, an objectively reasonable law

enforcement officer in Walls' position would have known that no arguable probable

cause existed to support issuance of arrest warrants for any crime at all, much less the

crime of Theft by Taking, and accordingly, that Buckner's subsequent arrest on such

charges deprived her of her liberty in violation of the Fourth Amendment of the

United States Constitution.

94.

Under the facts and circumstances alleged herein, an objectively reasonable law enforcement officer in Dellinger's position as a supervising officer, would have known that no arguable probable cause existed to support issuance of arrest warrants for any crime at all, much less the crime of Theft by Taking, and accordingly, that Buckner's subsequent arrest on such charges deprived her of her liberty in violation of the Fourth Amendment of the United States Constitution.

95.

Under the facts and circumstances alleged herein, an objectively reasonable law enforcement officer in Chief Williamson's position as a final policy maker for the UGA Police Department, would have known that the policies and customs described more fully herein would lead to the very kind of constitutional violation alleged herein, particularly, the illegal arrest of individuals, like Buckner, based upon an incomplete, one-sided and procedurally flawed investigation by untrained officers

acting outside the scope of their jurisdiction and/or limited expertise as campus police in violation of the Fourth Amendment of the United States Constitution.

96.

At all times relevant to this action, the law was established with obvious clarity that the conduct of the Defendants as alleged more specifically hereinabove violated the Fourth Amendment of the United States Constitution.

97.

As a direct and proximate cause of Defendants' unlawful actions, Buckner was seized and detained against her will, and thereby suffered a loss of liberty in violation of her rights under the Fourth Amendment to the United States Constitution, entitling her to actual and compensatory damages in an amount to be determined by the enlightened conscience of the jury.

98.

The actions of Defendants described herein were willful, deliberate, and malicious, thereby entitling Buckner to an award of punitive damages in an amount to be determined by the enlightened conscience of the jury.

## COUNT II

## FOURTH AMENDMENT – 42 U.S.C. §1983

### (Malicious Prosecution)

99.

The foregoing paragraphs are incorporated herein by this reference.

100.

As fully described herein in the proceeding paragraphs, the Defendants acts, omissions, policies and customs resulted in Buckner's arrest, seizure and prosecution, thereby depriving her of her liberty in violation the Fourth Amendment of the United States Constitution.

101.

Under the facts and circumstances alleged herein, an objectively reasonable public official in Shetterly's position would have known that failing to come forward

with truthful information directly exonerating Buckner of any criminal wrong doing following her arrest cause a further deprivation of her liberty as Buckner was subjected to prosecution by the Gwinnett DA in violation of the Fourth Amendment of the United States Constitution.

102.

Under the facts and circumstances alleged herein, an objectively reasonable law enforcement officer in Walls' position would have known that his efforts to lobby the Gwinnett DA's office, material witnesses and others to continue the prosecution of Buckner despite the clear lack of any probable cause resulted in an ongoing deprivation of Buckner's liberty as she was subjected to criminal prosecution in violation of the Fourth Amendment of the United States Constitution.

103.

Under the facts and circumstances alleged herein, an objectively reasonable law enforcement officer in Dellinger's position as a supervising officer, his efforts to lobby the Gwinnett DA's office, material witnesses and others to continue the prosecution of Buckner despite the clear lack of any probable cause resulted in an ongoing deprivation of Buckner's liberty as she was subjected to criminal prosecution in violation of the Fourth Amendment of the United States Constitution.

-37-

104.

Under the facts and circumstances alleged herein, an objectively reasonable law enforcement officer in Chief Williamson's position as a final policy maker for the UGA Police Department, would have known that the policies and customs described more fully herein would lead to the very kind of constitutional violation alleged herein, particularly, the illegal arrest and ongoing prosecution of individuals, like Buckner, based upon an incomplete, one-sided and procedurally flawed investigation by untrained officers acting outside the scope of their jurisdiction and/or limited expertise as campus police in violation of the Fourth Amendment of the United States Constitution.

105.

At all times relevant to this action, the law was established with obvious clarity that the conduct of the Defendants as alleged more specifically hereinabove violated the Fourth Amendment of the United States Constitution.

106.

As a direct and proximate cause of Defendants' unlawful actions, Buckner was subjected to an ongoing seizure and detention against her will while she was subjected to criminal prosecution in violation of her rights under the Fourth

-38-

Amendment to the United States Constitution, entitling her to actual and compensatory damages in an amount to be determined by the enlightened conscience of the jury.

107.

The actions of Defendants described herein were willful, deliberate, and malicious, thereby entitling Buckner to an award of punitive damages in an amount to be determined by the enlightened conscience of the jury.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(a)     That the Court declare that Defendants' actions, policies, and practices complained of herein violated Plaintiff's rights under the Fourth and Fourteenth Amendments of the Constitution of the United States of America;

(b)     That Defendants be permanently enjoined from violating the rights of Plaintiff and others under the Fourth and Fourteenth Amendments to the Constitution of the United States of America;

(c)     That special damages be awarded to compensate Plaintiff for her economic injuries as a consequence of Defendants' violations of her

-39-

rights in an amount to be determined by the enlightened conscience of the jury;

(d) That compensatory damages be awarded against each Defendant individually to compensate Plaintiff for her pain and suffering, mental and emotional distress, anxiety, humiliation, outrage, and loss of professional and personal reputation as a consequence of Defendants' actions in an amount to be determined by the enlightened conscience of the jury;

(e) That punitive damages be awarded against Defendants in an amount to be determined by the enlightened conscience of the jury to deter Defendants and others from similar misconduct in the future;

(f) That a trial by jury be had on all issues wherein a jury trial is permitted under law;

(g) That attorneys' fees and expenses of litigation be awarded as authorized under 42 U.S.C. § 1988;

(h) That prejudgment interest be awarded; and,

(i) That the Court award such other equitable or monetary relief as deemed just and proper.

-40-

Respectfully submitted, this ___8___ day of September, 2006.

WILLIAM J. ATKINS
State Bar No. 027060

*Counsel for Plaintiff*

**PARKS, CHESIN & WALBERT, P.C.**
75 14th Street, N.E., Suite 2600
Atlanta, Georgia 30309
Telephone:  (404) 873-8000
Facsimile:  (404) 873-8050
E-Mail: batkins@pcwlawfirm.com

STEPHEN F. LANIER
State Bar No. 437750

*Counsel for Plaintiff*

**THE LANIER FIRM**
410 East First Street
Rome, Georgia 30161
Telephone: (706) 292-0200
Facsimile: (706) 292-9222
Email: jaws5297@bellsouth.net