IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

TERRIE BUCKNER,                          *

     Plaintiff,                         *

                         *

vs.                                      *

                         *          CASE NO. 3:06-CV-79 (CDL)

CHIEF JIMMY WILLIAMSON, in his           *
official capacity as Chief of
the University of Georgia Police         *
Department; DETECTIVE PETER
WALLS, DETECTIVE ERIC DELLINGER,         *
and KAREN SHETTERLEY,

                         *

     Defendants.                        *
_____          *

O R D E R

Plaintiff Terrie Buckner filed the above-captioned action under 42 U.S.C. § 1983, alleging that Defendants Jimmy Williamson, Peter Walls, Eric Dellinger, and Karen Shetterley violated her Fourth and Fourteenth Amendment rights. Plaintiff contends that she was arrested without probable cause for allegedly stealing her employer's property. Presently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 18) as to each of Plaintiff's claims. For the reasons set forth below, the Court denies Defendants' motion as to Plaintiff's claims against Defendant Shetterley but grants Defendants' motion as to all of Plaintiff's other claims.

BACKGROUND

When construed in the light most favorable to Plaintiff, the record supports the following facts:

1

I.    **The ACET Grant Program**

Plaintiff, an educator specializing in early childhood education work force development, has experience directing grant programs designed to improve the quality of education in the United States. In 1998, Plaintiff was hired as Project Director for the Advancing Careers through Education Training program ("ACET"), "an umbrella organization that was funded by the Georgia Child Care Council to coordinate and manage . . . professional development for early childhood educators." (Pl.'s Dep. 65:21-25, May 1, 2007.)   ACET conducted training for education professionals and also administered various grant-funded programs.

A.    Structure of ACET and its Grant Programs

ACET was governed by its Board of Directors (the "Board") as well as an executive committee comprised of nine voting Board members.   The Board "serve[d] as the decision making body and [was] responsible for the formulation of the vision and overall policy" of the project.   (Ex. 1 to Defs.' Mot. for Summ. J. at Art. V, § 5.2, ACET Bylaws.)   One of the Board's responsibilities was to associate the program with an "administrative partner" or "administrative home," a legally incorporated non-profit or educational entity that would partner with the Board to fulfill each grant's goals.   Under ACET's bylaws, "[a]n Administrative Partner may provide staff and technical assistance to implement the goals of ACET[,] . . . make recommendations about the implementation of the strategic plan[,] and

2

carry out the strategies and action plans in the strategic plan as jointly agreed with the Board of Directors." (*Id.* at Art. V, § 5.1.) As compensation for serving as an administrative partner, an entity would generally receive a portion of the grant proceeds or some other type of indirect cost recovery.   Initially, Gainesville College served as ACET's administrative partner.

The Board also hired the ACET Project Director who would oversee the day-to-day administration of the various contracts and grants managed by ACET.   In 1998, the Board hired Plaintiff as project director.   Thus, Plaintiff oversaw ACET's main structure, which was funded by the Georgia Child Care Council ("GCCC"), as well the grants from other agencies that funded ACET's various projects.   Twelve individual contract programs fell under ACET's administrative umbrella, including: (1) the Incentives and Scholarships program, which was funded by grants from Smart Start United Way of Georgia ("Smart Start"); (2) the ACET Resource Library, which was funded by GCCC; (3) the Professional Development Registry, which was funded by the Georgia Department of Human Resources ("DHR"), the Department of Family and Children Services ("DFCS"), and Childcare and Parent Services ("CAPS"); and (4) the Training for Trainers Program, which was funded by GCCC.

In 2001, ACET received a large grant for the ACET Collaborative Team ("ACT") project, which was funded by DFCS and CAPS.   ACET's directors soon realized that Gainesville College did not have adequate resources to handle ACET's expanded mission.   The program

3

left Gainesville College in 2001 and formed a new administrative partnership with the University of Georgia's Georgia Center for Continuing Education ("Georgia Center").

> B.   The ACET-UGA Relationship

The receipt of the ACT grant and ACET's new partnership with the University of Georgia ("UGA") changed the program in several ways. For example, ACT funds were used to support three different existing ACET projects: (1) the ACET Resource Library; (2) the Training for Trainers Program; and (3) the Professional Development Registry. The Board also became concerned that UGA's indirect financial charges would eventually detract from ACET's goals, so the Board and Smart Start agreed that all ACT grant funds would first pass through Smart Start. This arrangement effectively prevented UGA from recovering indirect charges from ACT, ACET's largest grant. No monies from Smart Start, a private organization, ever funded the government-sponsored ACT project.

In addition, the ACET staff, including Plaintiff, became UGA employees. Although their salaries and benefits were paid with grant funds, those funds were funneled through UGA's payroll system. Defendant Karen Shetterley, UGA's Department Head of Grants and Contracts at the Georgia Center, was also named Principal Investigator for the ACET program. As the Principal Investigator, Shetterley was Plaintiff's immediate supervisor and was ultimately responsible for the fiscal management of the grant funds, including

4

the inventorying and safeguarding of grant equipment and supplies.[1]
(Schramski Dep. 20:3-11; 22:17-22; 23:2-7, June 12, 2007.)

C.   Dissolution of the ACET Program

In August of 2003, the Board learned that the State would not
fund the last year of the ACT grant.  Consequently, Shetterley
decided that UGA would no longer serve as ACET's administrative
partner and that ACET would have to vacate its UGA-owned offices in
Lawrenceville, Georgia effective June 30, 2004.  Because the grant
funding periods for certain ACET contracts did not expire until
September 30, 2004, Plaintiff and ACET employees Tamara Brookover and
Trudy Friar planned to work from home until September 30 to finish
the remaining work on any incomplete grants.

After unsuccessful attempts to locate an administrative home for
ACET, the Board decided essentially to dissolve the program and focus
on finding administrative homes for the individual ACET projects.
The Board also decided to "spend down" the remaining ACT funds by
using them to purchase equipment and supplies that would support the
Training for Trainers program.[2]  Before the June 30th deadline, the

---

[1]This delegation of authority appears to be consistent with ACET's
bylaws, which provided that "[s]taff provided through an administrative
partnership may be delegated any of the responsibilities of ACET's
operations as deemed necessary and appropriate to accomplish the goals and
objective of the organization" and required "ACET administrative partner
staff, or representative, [to] attend meetings of committees and the Board
of Directors."  (Ex. 1 to Defs.' Mot. for Summ. J. at Art. IX, § 9.1, ACET
Bylaws.)

[2]Presumably, the Board approved these expenditures in part because
Plaintiff had secured a new grant from GCCC that would fund Training for
Trainers through September 30, 2004, but the new GCCC grant did not
include funds for equipment and supplies.  In part because of the decision
to spend down the remaining grant funds, the Training for Trainers program

Board found administrative partners for the majority of the individual ACET programs: Care Solutions, Inc. agreed to take over the Scholarships and Incentives programs; the Georgia Association on Young Children ("GAYC") agreed to take over the resource library; and UGA agreed to retain the Professional Development Registry. The Board initially struggled to find an administrative partner for the Training for Trainers program, the largest component of the ACET program. As of the June 30th deadline, Training for Trainers had yet to secure future funding or an administrative home.

In mid-May of 2004, various members of the ACET board, allegedly including Shetterley, met at the Lawrenceville ACET offices to divide materials among the various programs. (Johns Aff. ¶ 16, Aug. 30, 2007.) Materials purchased with specific grant funds were earmarked to travel with the corresponding grant to its new administrative home. Laura Johns, a Board member, recalls that after dividing the materials, "there was an enormous amount of supplies and equipment that remained. Some of those materials were to accompany the Train the Trainers program, which had not yet found an administrative home." (*Id.*) UGA representatives, and ultimately Shetterley, were fiscally responsible for any "orphaned" equipment and supplies and thus believed that these items should have been retained by UGA until their ultimate transfer. (Schramski Dep. 47:18-48:11; *see also* Ex. 2 to Defs.' Mot. for Summ. J., Email to Plaintiff from Shetterley

---

had a significant amount of supplies associated with it.

("[i]f [certain materials were] purchased with funds other than Smart Start . . . [those materials] need[] to come back to UGA") (third alteration in original).)    However, Plaintiff testified that Shetterley directed Brookover to stop sending leftover equipment to UGA.  She also testified that ACET did not have sufficient funds to move and store the remaining equipment.  (Pl.'s Dep. 19:16-23, Apr. 23, 2007; Johns Aff. ¶ 17.)

On June 21, 2004, Plaintiff informed the Board that she had accepted a new position with a different state agency, but she assured the Board that she would be working "closely" with GAYC "to make the transition . . . a smooth one."  (Ex. C to Pl.'s Decl., Email from Plaintiff to Board.)  Johns averred that she expected Plaintiff to continue to work with ACET during the grant wind-down notwithstanding the fact that Plaintiff had a new job.  (Johns Aff. ¶¶ 18, 20.)  Plaintiff was to begin her new job on July 1, 2004.

On June 30, 2004, Plaintiff, ACET employees including Brookover and Friar, and several ACET Board members met at the ACET offices to supervise the distribution and moving of ACET equipment.  When the previously earmarked property had been properly distributed, a significant amount of materials remained.  Despite seeking direction from Shetterley, Plaintiff had received no guidance concerning the storage of leftover materials, and therefore she decided to safeguard the materials in her home until the programs with which the materials were associated could be assigned an administrative partner. Plaintiff took the majority of the leftover materials because her

home was the largest and the closest to the ACET offices.  Brookover
and Friar also took certain materials that they would need while
working from home to complete the unfinished grant projects. As Johns
explained, the Board members

> knew the remaining materials were not going to be housed by
> UGA and that ACET did not have the money to store the
> materials off site.  I knew that [Plaintiff] and the other
> ACET staff members, who were to remain employed until
> September 30 were going to store the materials in their
> homes.  That was not an uncommon practice.  I have been
> involved in numerous wind downs, and materials are often
> stored in former employees' homes pending their transfer to
> a new program or site.

(Johns Aff. ¶ 17.)  Plaintiff began working at her new job as
scheduled, and Brookover and Friar remained employed by UGA while
they completed the remaining work on the unfinished grants.

## II.  The Alleged Crime and its Investigation

In late July of 2004, UGA controller George Stafford received
information from a "concerned citizen" who alleged that UGA employees
were spending grant money inappropriately.  Stafford alerted Dale
Wetzelberger, UGA's internal auditor, and Defendant Jimmy Williamson,
UGA's chief of police, to the situation.  Williamson assigned two
officers, Defendants Peter Walls and Eric Dellinger, to investigate
the allegations of the concerned citizen.  The investigation
eventually centered on the ACET program, specifically implicating
only Tamara Brookover.  Brookover had listed various pieces of ACET
property for sale on eBay, and during the course of the
investigation, Brookover sold several items that had been purchased
with ACET grant money to Dellinger via eBay.

On August 26, 2004, Dellinger, Walls, and Wetzelberger arrived at Brookover's home to question her about the eBay sales.  Because Brookover was not home, Dellinger called Shetterley, involving her in the investigation for the first time.  Shetterley informed Dellinger that she had just been with Brookover at a previously-scheduled lunch meeting, after which Brookover turned in her UGA "P-Card" and some ACET property.[3]  When Brookover returned home shortly thereafter, she immediately confessed to listing the items on eBay.  When asked whether any other ACET employees had ACET property at their homes, Brookover informed Walls and Dellinger that Plaintiff also had ACET property stored in her home.  Walls also testified that Brookover informed police that all items originally purchased for ACET were supposed to be sent to either Smart Start or GAYC.  (Walls Dep. 139:25-140:10, June 14, 2007; Defs.' Ex. 12 to Mot. for Summ. J., Supplemental Incident Report at 4.)  Brookover never implicated Plaintiff in any criminal activity or insinuated that Plaintiff was also reselling ACET property.

On August 27, 2004, Dellinger and Walls went to Plaintiff's home.  When she was notified that the police wished to speak with her, Plaintiff left work and returned home.  Walls and Dellinger

---

[3]The items Brookover returned to Shetterley were the same items she had originally listed on eBay.  Although Brookover sold the items to Dellinger, she had a change of heart, did not deliver the items, and refunded Dellinger's money.  Some of these items had been purchased with her P-Card.  Certain UGA employees were authorized to make employment-related purchases using a university "P-Card."  Brookover and Plaintiff were each authorized to use a P-Card.  The investigation primarily focused on allegations that Brookover and Plaintiff were illegally reselling items that had been properly procured.

accused Plaintiff of using her P-Card to purchase and resell ACET property.  The officers asked Plaintiff "three questions maybe at the most" and also requested that Plaintiff make a statement.  (Pl.'s Dep. 121:21-22.)  Plaintiff provided a written statement to Dellinger explaining, in its entirety:

> I assured inventory items were moved to CSI [Care Solutions, Inc.] for SSG [Smart Start Georgia].  I was given no further directions or information therefore I stored items for safekeeping until further notice.  These items were released to UGA police along with work related items I used in performing my job.

(Pl.'s Ex. 36 to Walls Dep., Pl.'s Handwritten Statement.)  Plaintiff also told police that Shetterley knew that she worked from home and that Shetterley and the other Board members knew that she was storing ACET property.   (Pl.'s Decl. ¶¶ 20, 21.)  Walls and Dellinger provided Plaintiff with a list of "missing" ACET property, and Plaintiff took the list into her home and returned the items she could easily retrieve.[4]

---

[4]This list was apparently compiled by UGA's auditing department, which conducted an audit of Plaintiff's and Brookover's P-Card purchases. The list was not intended to be a complete inventory of ACET property. (Wetzelberger Dep. 71:14-72:14, June 5, 2007.)  For example, the auditors only checked purchases made with Plaintiff's and Brookover's P-Cards, but several other ACET projects had P-Cards associated with their grants as well.  In addition, some purchases were generally not made with P-Cards, particularly purchases of non-fungible goods of over $500.  (*Id.* at 28:1-6.)

A complete inventory of all grant equipment was apparently never made during the investigation. Although Shetterley contends that she asked the ACET staff to conduct a thorough inventory of the supplies, Plaintiff denies this contention. (Shetterley Dep. 78:3-10, June 15, 2007; Pl.'s Dep. 102:17-103:16.)  It also appears that Walls and Dellinger never contacted the agencies to whom the property allegedly belonged, most notably Smart Start, to verify whether those agencies were missing any property they had expected to receive after the ACET dissolution. (*See, e.g.,* Dellinger Dep. 153:1-154:9, July 26, 2007.)

On August 29, 2004, Plaintiff emailed Shetterley describing her encounter with the police and explaining why she had the property in her home.  Shetterley provided Dellinger a copy of this email when they met on August 30, 2004 and informed Dellinger that she was unaware that Plaintiff was storing property at her personal residence.  Shetterley also explained that Plaintiff had no remaining responsibilities with respect to the ACET project.  Dellinger recalls that Shetterley was "basically being adamant that there was no authorization for [Plaintiff] to have this stuff for safekeeping; that if anybody should have . . . known about it, it should have been Ms. Shetterley." (Dellinger Dep. 144:23-145:5.)  On August 31, 2004, UGA employees went to Plaintiff's house to retrieve the remaining ACET property.[5]  The materials were stored in open boxes and did not readily appear to be in use, and Plaintiff assisted with packing and inventorying the items.  (Hedgelon Dep. 56:4-57:6, June 13, 2007, Pl.'s Ex. 22 to Hedgelon Dep., Handwritten Statement at 2.)

Plaintiff soon realized that Shetterley may have misunderstood or forgotten how the leftover ACET materials were supposed to be distributed among the grant programs, particularly since Plaintiff knew that Shetterley "frequently confused" the ACT and Smart Start contracts.  (Pl.'s Dep. 144:7-8 & 23-24.)  According to Plaintiff,

---

[5]Friar also had ACET property in her home, but she contacted Shetterley on August 27th to ask whether she could return the materials. Shetterley told police "I was aware that [Friar] had items at her home that she needed to do the trainings and meet the deliverables on the project."  (Pl.'s Ex. 6 to Williamson Dep., Shetterley Typewritten Statement at 1.)

"the equipment in question[] was to go one place if GAYC got funding for the training program; if it didn't, then it was to go back to UGA. So we were waiting on word about whether that funding was received or not." (Pl.'s Dep. 52:10-14.) On September 2nd, Plaintiff contacted Shetterley via email in an effort to clarify this potential misunderstanding. Despite knowing that the relationship between Smart Start and ACT was common knowledge among "[e]very ACET Board member, including Karen Shetterley," (Johns Aff. ¶ 13), Plaintiff reminded Shetterley that Smart Start was merely serving as a check-writer for ACT funds. Because Smart Start only served as a "pass-through" entity, materials purchased with ACT funds did not belong to Smart Start and were not supposed to be distributed to Smart Start. Shetterley forwarded this email to her supervisor, Elizabeth Humphreys, but Shetterley did not specifically inform Walls or Dellinger of its existence. (Shetterley Dep. 162:13-163:25.)

On September 7, 2004, Shetterley met with Walls. Shetterley reiterated that all property purchased with ACET funds should have been taken to Smart Start or GAYC. (Walls Dep. 214:11-16.) That same day, Brookover sent an email to Shetterley's supervisors, explaining that a full inventory of ACET property had never been done and that she and the other ACET employees never understood that all the leftover materials should have been delivered to Smart Start. (Pl.'s Ex. 5 to Williamson Dep., Email from Brookover to Humphreys.) This email again corroborated Plaintiff's explanation for possessing the property and refuted Shetterley's assertion that all materials should

have been distributed to other entities upon ACET's dissolution. Although Shetterley's supervisor forwarded Brookover's email to Shetterley on September 8th, Shetterley never informed Walls and Dellinger of the email or this potential misunderstanding. (Shetterley Dep. 167:25-168:7.)  Walls and Dellinger both admitted that they would have conducted a more thorough investigation of the alleged theft had they received this information.  (Dellinger Dep. 175:15-20; Walls Dep. 233:24-234:6.)

On September 13, 2004, Walls applied for ten arrest warrants against Plaintiff for felony theft by taking under O.C.G.A. § 16-8-2. Plaintiff turned herself in the morning after the warrants issued. Plaintiff alleges that, among other things, she was terminated from her new position and from a position at Shorter College as a direct result of the arrest and its attendant publicity.  On July 13, 2005, the Gwinnett County District Attorney's office informed Plaintiff that it would not prosecute her on the charges.  On September 11, 2006, Plaintiff filed this action, asserting § 1983 claims against Williamson in his official capacity, as well as against Walls, Dellinger, and Shetterley.  Plaintiff alleges that each Defendant's role in her arrest violated her Fourth and Fourteenth Amendment rights.  Plaintiff also seeks attorney's fees pursuant to 42 U.S.C. § 1988.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial." *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In determining if the parties have met their respective burdens, the Court resolves "all reasonable doubts about the facts in favor of the non-movant, and draw[s] all justifiable inferences in his . . . favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks and citation omitted). Additionally, "[i]f reasonable minds might differ on the inferences arising from

14

undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (internal quotation marks and citation omitted).

DISCUSSION

## I. Claims Against Defendant Williamson in his Official Capacity

Plaintiff sues UGA Police Chief Jimmy Williamson in his official capacity, alleging that his acts and omissions as chief policy-maker for the UGA Police Department led to her false arrest and malicious prosecution. (Compl. ¶¶ 91, 95.)[6]

### A.   Claims for Money Damages against Defendant Williamson

It is clear that any § 1983 claim for money damages Plaintiff asserts against Defendant Williamson in his official capacity must fail. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted). It is well

---

[6]Although they did not discuss Eleventh Amendment immunity in their original briefs, Defendants arguably raised the defense in their Answer, contending that "Defendant Williamson is entitled to immunity from suit; to the extent that other Defendants are sued in their official capacity, they are also entitled to immunity from suit." (Answer 2.) It is unclear from the Complaint whether Walls, Dellinger, and Shetterley are being sued in their official capacities as well as their individual capacities. The Court ordered the parties to submit supplemental briefs addressing the Eleventh Amendment immunity issue. Plaintiff again failed to address whether she was suing Defendants Walls, Dellinger, and Shetterley in their official capacities, and therefore the Court finds that these defendants are sued in their individual capacities only.

established that "a State is not a 'person' within the meaning of §
1983," and it is therefore not amenable to suit under that provision.
*Id.* at 65.  Because Williamson is clearly a state official sued in
his official capacity, he is not considered a "person" for purposes
of Plaintiff's claim for money damages under § 1983.  Williamson is
therefore entitled to summary judgment to the extent that Plaintiff
seeks to recover money damages under § 1983.  *See, e.g., Edwards v.
Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995).

    B.   <u>Claims for Injunctive Relief against Defendant Williamson</u>

    While Williamson is not considered a "person" in a § 1983 suit
for money damages, "a state official sued in his official capacity is
a person for purposes of § 1983 when prospective relief, including
injunctive relief, is sought." *Edwards*, 49 F.3d at 1524; *accord
Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her
official capacity, when sued for injunctive relief, would be a person
under § 1983 because 'official-capacity actions for prospective
relief are not treated as actions against the State.'" (quoting
*Kentucky v. Graham*, 473 U.S. at 167 n.14)).  In the supplemental
briefing ordered by the Court, Plaintiff

> stipulate[s] that she seeks only equitable relief from
> Williamson . . . in the form of an injunction compelling
> the UGA Police Department to limit its jurisdiction to 500
> feet from the boundaries of the University of Georgia . .
> . and to expunge all records of Plaintiff's arrest,
> including the criminal warrants Defendants took out against
> her, so as to avoid future disclosure of that information.

(Pl.'s Reply to Def. Jimmy Williamson's Supplement to Defs.' Mot. for Summ. J. & Br. in Supp. 2.)   Even though § 1983 permits such suits, Plaintiff's claims for injunctive relief against Defendant Williamson may still be barred by principles of Eleventh Amendment immunity.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

"Under most circumstances, the Eleventh Amendment bars suits against states and state entities by their citizens." *Williams v. Bd. of Regents of the Univ. Sys. of Ga.*, 477 F.3d 1282, 1301 (11th Cir. 2007).   Three limited exceptions to Eleventh Amendment immunity exist.   First, "[a] State remains free to waive its Eleventh Amendment immunity from suit in a federal court." *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002) (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985)). Second, "a party may sue the state if . . . Congress has validly abrogated the state's immunity." *Williams,* 477 F.3d at 1301 (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999)). Third, the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), permits a plaintiff to seek prospective injunctive relief against a state official in his official capacity for an alleged constitutional violation.   *See, e.g., Scott v. Taylor*, 405 F.3d 1251, 1255 (11th Cir. 2005).

17

Plaintiff in this case does not assert that Eleventh Amendment immunity was either waived or abrogated with respect to her § 1983 claims. *See, e.g., Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) (per curiam) ("It is clear that Congress did not intend to abrogate a state's eleventh amendment immunity in section 1983 damage suits."). Thus, Plaintiff's claims for injunctive relief may survive only if the principles articulated in *Ex parte Young* apply.

The *Ex parte Young* exception provides that "official capacity suits for prospective relief to enjoin state officials from enforcing unconstitutional acts are not deemed to be suits against the state and thus are not barred by the Eleventh Amendment." *Scott*, 405 F.3d at 1255. In other words, "the Eleventh Amendment does not prohibit a plaintiff from suing state officials in their official capacities for prospective injunctive relief and costs associated with that relief." *Stevens v. Gay*, 864 F.2d 113, 115 (11th Cir. 1989). To determine whether the *Young* exception applies, the Court "need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in judgment)) (alteration in original). This inquiry "does not include an analysis of the merits of the claim." *Id.* at 646. A "prayer for injunctive relief—that

18

state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies [the court's] 'straightforward inquiry.'" *Id.* at 645.

Plaintiff here arguably seeks some prospective injunctive relief that is directly related to the constitutional violations she alleges. Specifically, Plaintiff seeks the expungement of her arrest record.[7] Accordingly, the *Ex parte Young* exception applies, and Defendant Williamson is not entitled to Eleventh Amendment immunity on Plaintiff's claim for expungement.[8] *See, e.g., Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992) (finding that Eleventh Amendment did not bar prisoners' claim for expungement of their disciplinary records because claim was for prospective injunctive relief); *Elliot v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986) (finding that claims for

---

[7]Neither party raised the issue of whether Defendant Williamson lacks the legal authority to expunge Plaintiff's arrest record and the accompanying documentation.

[8]Plaintiff also seeks equitable relief "in the form of an injunction compelling the UGA Police Department to limit its jurisdiction to 500 feet from the boundaries of the University of Georgia." (Pl.'s Reply to Def. Jimmy Williamson's Supplement to Defs.' Mot. for Summ. J. and Br. in Supp. 2.) Georgia law limits the authority of campus policemen to make arrests to "any property under the jurisdiction of the board of regents and for offenses committed upon any public or private property within 500 yards of any property under the jurisdiction of the board." O.C.G.A. § 20-3-72. This jurisdictional limitation does not apply to the authority of a certified campus police officer to obtain an extra-territorial search warrant. *See State v. Harber*, 198 Ga. App. 170, 171, 401 S.E.2d 57, 58 (1990). At any rate, "[a]n injunction ordering [Defendants] to 'obey the law' would serve little purpose." *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1176 (11th Cir. 2001), *vacated by* 536 U.S. 953 (2002), *opinion reinstated by* 323 F.3d 950 (11th Cir. 2003). Therefore, the Court finds that *Ex parte Young* does not apply to Plaintiff's request that the Court compel the UGA police department to limit its jurisdiction to 500 feet from the boundaries of UGA.

reinstatement and expungement of personnel records were not barred by the Eleventh Amendment because the relief sought was "clearly prospective in effect and thus falls outside the prohibitions of the Eleventh Amendment"); *see also Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (finding that *Ex parte Young* exception applied to claims by student seeking expungement of a failing grade and plagiarism conviction because "the 'F' and the plagiarism conviction would constitute a continuing injury to the plaintiff," the "requests for expungement would relate to an ongoing violation of federal law[,] and the relief granted would be prospective in nature").

Based on the foregoing, the Court has jurisdiction to decide Plaintiff's § 1983 claim against Defendant Williamson.  The Court finds, however, that Plaintiff has failed to direct the Court to evidence sufficient to create a genuine issue of material fact as to whether Williamson can be held liable under § 1983.  Plaintiff claims that Williamson (1) does not require UGA Police employees to undergo "the kind of training and experience typically held by officers in law enforcement agencies charged with conducting a major felony theft investigation"; (2) "has maintained a custom of instituting formal criminal investigations based solely" upon unsubstantiated tips from confidential informants; (3) "has maintained a custom of pursuing criminal investigations beyond the designated jurisdictional limitations placed upon the UGA police"; and (4) "has maintained a custom of pursuing one sided investigations that routinely ignore

readily available evidence that would tend to point to the innocence of the subjects of such investigations." (Compl. ¶¶ 50-53.)

Under § 1983, "[t]here is no respondeat superior making Defendant [Williamson] in his official capacity . . . liable for the wrongful acts of [his] officers." *Jones v. Cannon*, 174 F.3d 1271, 1293 n.15 (11th Cir. 1999). Instead, "[o]fficial capacity claims . . . are based on a Sheriff's Office's policies or customs purportedly causing the alleged constitutional violations." *Id.* Plaintiff has directed the Court to no evidence that Williamson maintained the policies or customs that she alleges led to the violation of her constitutional rights. In fact, Plaintiff failed to explain her basis for Williamson's liability in either her response to Defendants' motion for summary judgment or in the supplemental briefing permitted by the Court. "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.; accord Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990) (rejecting the contention that "where a party includes information in declarations or affidavits related to a summary judgment motion which might form the basis of an argument or defense, but the party fails to articulate

21

such an argument" the district court must consider the argument sua sponte).  Because Plaintiff has not directed the Court to sufficient evidence supporting her allegation that Defendant Williamson should be held liable under § 1983, Williamson is entitled to summary judgment on Plaintiff's claims against him.

## II.  Claims Against Defendants in their Individual Capacities

Plaintiff next asserts that Walls, Dellinger, and Shetterley violated her federally-protected rights and are therefore liable under 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Plaintiff contends that Defendants violated her Fourth and Fourteenth Amendment rights to be free from false arrest and malicious prosecution.  Among other defenses, Defendants "submit that they are all entitled to qualified immunity" as to each of Plaintiff's claims. (Answer 2.)

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982)).  The defendant has the burden of proving that he or she was performing a discretionary function; once proven, the burden then shifts to the plaintiff to show that qualified immunity is not appropriate.  *Id.*  To determine whether qualified immunity is appropriate, the Court must first decide whether "the facts alleged show the officer's conduct violated a constitutional right" and must then decide "whether the right was clearly established . . . in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  For the following reasons, the Court finds that Walls and Dellinger are entitled to qualified immunity but that genuine issues of material fact exist as to whether Defendant Shetterley is similarly entitled.

A.    Defendants Walls and Dellinger: Qualified Immunity

Plaintiff concedes that Walls and Dellinger were acting within their discretionary authority when they investigated and arrested Plaintiff. (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. 33.) The Court thus proceeds to the next step in the qualified immunity analysis: whether Walls and Dellinger violated one of Plaintiff's clearly-established constitutional rights.[9]

---

[9]Plaintiff brings § 1983 claims for both false arrest and malicious prosecution.  While these claims require similar proof, they are distinguishable.  The U.S. Supreme Court has explained:

> If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more.  From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself.

23

In this case, Plaintiff contends that qualified immunity is inappropriate because the record does not demonstrate that Walls and Dellinger had either actual or arguable probable cause to arrest her for theft by taking.   In addition, Plaintiff asserts that both the investigation and the arrest warrant that led to her arrest were constitutionally insufficient.   The Court finds that Walls and Dellinger had arguable probable cause to justify Plaintiff's arrest. Accordingly, Walls and Dellinger are entitled to qualified immunity.

   1.   *Existence of Actual or Arguable Probable Cause*

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." U.S. Const. amend. IV.   An arrest executed without actual probable cause violates the Fourth Amendment of the Constitution and can serve as the basis for a § 1983 claim, even when the arrest is supported by a warrant.   *See Malley v. Briggs,* 475 U.S. 335, 339-41 (1986). Actual "[p]robable cause exists when the facts and circumstances within the officers' knowledge, of which he or she has reasonably

---

*Wallace v. Kato*, 127 S. Ct. 1091, 1096 (2007) (internal quotation marks and citation omitted)).  With respect to Defendants Walls and Dellinger, the distinction between the two claims is irrelevant, as the existence of probable cause precludes recovery under either theory.  *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) ("The existence of probable cause at the time of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest."); *Wood v. Kesler*, 323 F.3d 872, 882-83 (11th Cir. 2003) (finding qualified immunity appropriate for malicious prosecution claim where the plaintiff failed to show that the officer acted without probable cause).  Plaintiff's malicious prosecution claim against Defendant Shetterley is discussed in section **II.**B. *infra*.

trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007) (internal quotation marks and citation omitted).

In the context of qualified immunity, however, the fact that an officer arrests an individual without actual probable cause "does not inevitably remove the shield of qualified immunity." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). For qualified immunity purposes, the Court instead applies the standard of *arguable* probable cause. *Id.* Arguable probable cause exists where "'reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[s] *could have believed* that probable cause existed to arrest.'" *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002)). The lesser standard of arguable probable cause "recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists." *Id.*

Walls and Dellinger are entitled to qualified immunity if Plaintiff fails to show that they violated her Fourth Amendment rights. In other words, if Plaintiff's arrest was justified by either actual or arguable probable cause, Walls and Dellinger would be immune from suit. "When the facts are not in dispute, whether

probable cause existed is a question of law, and summary judgment is appropriate." *Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990).  In this case, some of the facts that contributed to the officers' suspicion of Plaintiff are disputed.  For example, Walls testified that he thought it was "suspicious" that Plaintiff asked Brookover "what am I go [sic] to do with all this shit in my garage" when Brookover called Plaintiff to warn her that the police were on the way.  (Walls Dep. 178:11-12, 179:10.)  Plaintiff denies making that statement.  (Pl.'s Decl. ¶ 16.)  Dellinger testified he was suspicious that Plaintiff failed to disclose the presence of additional ACET equipment in her home.  (Dellinger Dep. 202:7-204:22.)  Plaintiff contends that she informed the officers of the presence of the additional equipment before the officers left her home.  (Pl.'s Decl. ¶ 24.)  Notwithstanding these disputed facts which the Court construes in Plaintiff's favor, the Court finds that no reasonable juror could conclude that Walls and Dellinger lacked arguable probable cause.

It is undisputed that a confidential informant alerted Walls and Dellinger to Brookover's unlawful activity, that the officers corroborated Brookover's unlawful activity, and that Brookover in turn informed the officers that Plaintiff also possessed ACET property at her home.  It is also undisputed that Brookover told police that the property was purchased with UGA P-Cards and that all of the property was supposed to be transferred to either Smart Start

or GAYC when the ACET office closed on June 30, 2004.[10]  When Walls and Dellinger arrived at Plaintiff's house, Plaintiff contends that she told the officers that she used some of the equipment to work from home and that Shetterley knew that she was doing so.  (Pl.'s Decl. ¶¶ 20, 21.)  Plaintiff also explained that she was temporarily holding the items for safekeeping and that ACET employees and Board members knew where the items were.[11]  (Pl.'s Decl. ¶ 22.)  Dellinger also does not dispute that the officers did not have probable cause to arrest Plaintiff when they left her home, presumably because Plaintiff had proffered a plausible explanation for her possession of the property.  (Dellinger Dep. 136:4-11.)

However, it is also undisputed that when Walls and Dellinger attempted to corroborate Plaintiff's story, Plaintiff's supervisor directly and emphatically contradicted Plaintiff's version of the facts.  Shetterley confirmed Brookover's statement that all the ACET equipment was to be distributed to other entities upon the June 30th dissolution of the ACET office.  (Pl.'s Ex. 6 to Williamson Dep., Shetterley Typewritten Statement at 1.)  Shetterley's handwritten statement to the officers indicated that she had met with Plaintiff "on at least a monthly basis where possible" to discuss the ACET

---

[10]Plaintiff "admits only that Walls offered this testimony at his deposition." (Pl.'s Resp. to Defs.' Statement of Material Facts ¶ 61.) Brookover was apparently never deposed.

[11]Shetterley was a member of the Board and of the smaller ACET executive committee, which was composed of voting Board members. (Pl.'s Dep. 47:19-23.)

transition, and "[a]t those meetings, it was discussed that <u>all</u> items that were purchased by Smart Start . . . contracts would be returned to Smart Start." (Pl.'s Ex. 35 to Walls Dep., Shetterley Handwritten Statement at 1.)  Shetterley also provided the officers a copy of notes used during one of her meetings with Plaintiff that corroborated her statement that Plaintiff was responsible for transferring ACET property to either Smart Start or GAYC. (Pl.'s Ex. 4 to Williamson Dep. at 8, Supplemental Incident Report; Pl.'s Ex. 35 to Walls Dep., Shetterley Handwritten Statement at 1.)  Shetterley also wrote, "I did not authorize [Plaintiff] to work from home after her termination date of June 30, 2004.  She was not authorized to work from home in the months prior to that or during her time of employment at the [Georgia Center] to my knowledge." (Pl.'s Ex. 35 to Walls Dep., Shetterley Handwritten Statement at 2.)  Shetterley's typewritten statement to the police also stated that Plaintiff "doesn't have work responsibilities regarding the ACET contracts." (Ex. 6 to Williamson Dep., Shetterley Typewritten Statement at 1.) In sum, Shetterley emphasized that she was unaware that Plaintiff possessed the property and that Shetterley never authorized Plaintiff to do so.  (Dellinger Dep. 144:23-145:17.)  The officers also discovered at least some evidence that could indicate that Plaintiff had converted ACET property to her own use.[12]  (Walls Dep. 175:3-7.)

---

[12]The officers found a CD, which Plaintiff said was not UGA property, in a Bose CD player belonging to ACET.  (Dellinger Dep. 118:4-12.)  In addition, the officers found a tape of "Friday," an R-rated movie, in a TV/VCR combination belonging to ACET.  Plaintiff does not dispute that the

Plaintiff was arrested for theft by taking pursuant to O.C.G.A. § 16-8-2, which provides: "A person commits the offense of theft by taking when he unlawfully takes or, being in lawful possession thereof, unlawfully appropriates any property of another with the intention of depriving him of the property, regardless of the manner in which the property is taken or appropriated."   The relevant inquiry, then, is whether "the information known to the defendant officers or officials at the time of their conduct, [and] not the facts known to the plaintiff then or those known to a court later" is sufficient to support a conclusion that Plaintiff committed the offense.   *Jones*, 174 F.3d at 1283 n.4.[13] Based on this record, the

---

officers found the movie in the television but later asserted that the movie "did not belong to me or anyone in my family." (Pl.'s Decl. ¶ 26.) Whether Plaintiff's explanation is true is irrelevant for purposes of the inquiry presently before the Court: whether the facts, as known to Walls and Dellinger at the time of Plaintiff's arrest, would have allowed a reasonable officer to conclude that arguable probable cause to arrest Plaintiff for theft by taking. *See Skop*, 485 F.3d at 1137.

[13]Plaintiff also contends that although theft by taking is a specific intent crime under Georgia law, there is no evidence that Walls and Dellinger had probable cause supporting the intent element of the crime. The Court reiterates, however, that it is undisputed that Plaintiff possessed property that did not belong to her and that Plaintiff's supervisor told police that she did not know Plaintiff possessed the property, that Plaintiff was no longer a UGA employee, and that Plaintiff was not authorized to have such property.   There is also at least some evidence that Plaintiff converted the property to her own use.  Intent may be presumed from a party's actions.  *Jordan*, 487 F.3d at 1355 (finding that "[b]eyond [a party's actions], an officer would need no further evidence of Plaintiff's intent to cause Plaintiff's arrest" for a general intent crime); *see also United States v. Martinez*, 96 F.3d 473, 478 n.7 (11th Cir. 1996) ("[A]cts indicate the intention."); *Jordan*, 487 F.3d at 1355 ("No officer has a duty to prove every element of a crime before making an arrest" because "'[p]olice officers are not expected to be lawyers or prosecutors.'" (quoting *Scarbrough v. Myles*, 245 F.3d 1299, 1303 n.8 (11th Cir. 2001)).  The Court thus rejects Plaintiff's argument.

Court concludes that "'reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[s] *could have believed* that probable cause existed to arrest.'" *Skop*, 485 F.3d at 1137 (quoting *Lee*, 284 F.3d at 1195). Because Plaintiff's arrest was supported by at least arguable probable cause, she has failed to establish that Walls and Dellinger violated her Fourth Amendment rights for qualified immunity purposes.

### 2.   Insufficient Investigation

Plaintiff also contends that Walls and Dellinger are not entitled to qualified immunity because the arguable probable cause supporting qualified immunity was based upon an inadequate investigation.   Plaintiff argues that she provided Walls and Dellinger with potentially exculpatory information that Defendants failed to properly investigate.[14]   For example, although Plaintiff contends that she told the officers that the ACET Board and ACET employees knew that she was storing leftover ACET materials for safekeeping, Defendant Walls testified that he never knew that the ACET Board existed.[15]   (Pl.'s Decl. ¶ 22; Walls Dep. 262:1-3; 264:20-

_____

[14]The record indicates that neither Walls nor Dellinger knew of the September 2 and September 7 emails that Plaintiff claims are exculpatory. "[A]n officer has [no] affirmative obligation to seek out exculpatory information of which the officer is *not* aware." *Kelly v. Curtis*, 21 F.3d 1544, 1551 (11th Cir. 1994).

[15]Defendants contend that the Court should not consider Plaintiff's affidavit because it is inconsistent with Plaintiff's deposition testimony.   The Court recognizes that "a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony without giving any valid explanation." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736

265:21.)  Walls further testified that had he known that the Board existed, he would have inquired further into the circumstances of the alleged theft.  (Walls Dep. 262:1-263:23.)  Plaintiff also contends that when the officers asked whether she planned to return the equipment, she informed them that she had already purchased postage and supplies for this purpose; Defendant Walls testified that this explanation would also have encouraged him to investigate further.  (Pl.'s Decl. ¶ 23; Walls Dep. 266:3-21.)  In addition, Plaintiff contends that readily-available documentary evidence would have further corroborated her explanation.

Plaintiff relies on the Eleventh Circuit's decision in *Kingsland v. City of Miami*, which cautions that an officer investigating the existence of probable cause "should not be permitted to turn a blind eye to exculpatory information that is available to them, and instead support their actions on selected facts they ch[o]ose to focus upon." 382 F.3d at 1228.  While "a police officer is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest . . . an officer may not choose to ignore information that has been offered to him or her, . . . conduct an investigation in a biased fashion[,] or elect not to obtain easily discoverable facts[.]" *Id.* at 1229.

_____

F.2d 656, 656 (11th Cir. 1984).  In this case, however, the Plaintiff's affidavit does not appear to be "inherently inconsistent with [her] earlier testimony," and thus the affidavit and deposition testimony may be read in conjunction and create genuine issues of material fact.  *Id.* at 658.

While *Kingsland* suggests that it is possible to base a § 1983 claim upon on a deficient investigation, the Eleventh Circuit was careful to note that *Kingsland* was "a unique and exceptional case wherein the investigating officers were responding to a call made by a fellow officer . . . to an accident involving that very officer" and the plaintiff "complain[ed] of a conflict of interest and suggest[ed] a possible motive for allegedly covering up a fellow officer's wrongdoing." *Id.* at 1228 n.9. This case presents no such allegations, at least with respect to Walls and Dellinger.[16] Instead, the record reveals that Walls and Dellinger elicited a statement from Plaintiff and then attempted to corroborate Plaintiff's statement by speaking with Shetterley—Plaintiff's supervisor and the person who Plaintiff claimed understood that Plaintiff was storing ACET property. Shetterley's testimony, and at least some documentary evidence supplied by Shetterley, supported a conclusion that Plaintiff was lying. While a reasonable investigator "should consider a suspect's explanation in evaluating the existence of probable cause, he is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest if the facts as initially discovered provide

---

[16]Plaintiff does argue that Shetterley's motive to lie to the police was that she was engaged in a "cover up" of her own deficient job performance. (*See* Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. 2.) As the grant's Principal Investigator, Shetterley was ultimately responsible for ensuring the integrity of the grant's inventory. (Schramski Dep. 20:3-11; 22:17-22; 23:2-7.) According to Plaintiff, Shetterley therefore should have known that more than $34,000 worth of ACET property was being stored at Plaintiff's home.

probable cause." *Williams v. City of Homestead, Fla.*, 206 F. App'x 886, 888-89 (11th Cir. 2006) (internal quotation marks and citation omitted); *accord Marx*, 905 F.2d at 1507 n.6 (defendant officers "were under no obligation to give credence to [plaintiff's] theory" and "were not required to forego arresting [plaintiff] based on initially discovered facts showing probable cause simply because [plaintiff] offered a different explanation"). The Court concludes that while Walls and Dellinger arguably could have conducted a more thorough investigation, the quality of their investigation does not deprive them of qualified immunity. Under all of the circumstances, they had arguable probable cause to arrest Plaintiff based upon a reasonable investigation.

### 3.  Insufficient Affidavit

Finally, Plaintiff argues that the affidavit supporting the arrest warrant was constitutionally insufficient because it incorrectly lists "the University of Georgia" as the "owner" of the stolen property and the "victim" of the crime, because it is conclusory, and because it contains insufficient evidence of Plaintiff's intent. (*See* Pl.'s Ex. 33 to Walls Dep., Arrest Warrants.) While it appears that the property retained by Plaintiff may not technically have been the property of UGA, there is no question that the property did not belong to Plaintiff. (*See* Schramski Dep. 39:14-40:11 (explaining that equipment purchased with grant funds is the property of the sponsoring agency but is

33

inventoried by UGA).)   In other words, it is undisputed that the equipment retained by Plaintiff was the "property of another." O.C.G.A. § 16-8-2.  The record also indicates that UGA, as the fiscal agent for the grants and the party that actually contracts with the grant sponsors, had fiscal responsibility for the property.[17]  (*See, e.g.,* Schramski Dep. 18:11-13; 23:2-7.)

The Court also rejects the argument that Defendants can be held liable under § 1983 based upon the conclusory nature of the arrest warrant and affidavit in this case.  The Eleventh Circuit has held that a constitutionally insufficient arrest warrant may serve as the predicate constitutional violation for a § 1983 claim.  *Garmon v. Lumpkin County, Ga.*, 878 F.2d 1406, 1408-10 (11th Cir. 1989).   In *Garmon*, the arrest warrant was sworn out by an investigator "who had relatively little involvement in the case" and who simply swore that "to the best of (his or her) knowledge and belief [the plaintiff] did . . . commit the offense . . . ."  *Id.* at 1408 (second alteration in original).  The court determined that "[f]rom the face of the arrest warrant it is evident that it was issued without probable cause." *Id.*  The court reasoned that the issuing magistrate could not have independently assessed probable cause because the stated basis for issuance of the warrant was "sufficient causes made known to me *in*

---

[17]Shetterley provided Walls and Dellinger with copies of the various ACET grant contracts, which indicated that the contracts were between the funding agencies and UGA.  (Pl.'s Ex. 62 to Shetterley Dep., Contract between UGA and Smart Start; Pl.'s Ex. 6 to Williamson Dep., Shetterley Typewritten Statement at 2.)

*the above affidavit*[,]" but the affidavit was devoid of "information providing the basis for the affiant's belief []or any affirmative allegation that the affiant had personal knowledge of the circumstances surrounding the alleged commission of the crime." *Id.* at 1408-09. The court therefore rejected the argument "that the magistrate's issuance of the arrest warrant conclusively establishe[d] the existence of probable cause."[18] *Id.* at 1408.

The circumstances presented in *Garmon* are distinguishable from those of this case. The defendants in *Garmon* never possessed probable cause. *See Garmon*, 878 F.2d at 1410 ("[T]he record does not disclose that [the defendant sheriff] has been able at any time to state any fact or combination of facts that would constitute probable cause. At oral argument, with the advantage of hindsight and reflection, his counsel confessed an inability to do so."); *see also Kelly*, 21 F.3d at 1554-55 (finding arrest warrant for possession of cocaine constitutionally insufficient when the record indicated that officer knew laboratory tests established that substance was not cocaine, i.e., that officer did not have probable cause). Thus, the issue in *Garmon* was really whether the issuance of an arrest warrant

---

[18]The *Garmon* court also rejected the defendants' assertion that the subsequent grand jury indictment established the existence of probable cause to issue the arrest warrant, because "[w]hen the warrant issues and the arrest occurs *before* an indictment is handed down, . . . the question whether probable cause existed for the arrest must be answered by reviewing the facts that were before the magistrate." *Garmon*, 878 F.2d at 1409. In this case, there is no indication that the district attorney's office submitted the charges against Plaintiff to a grand jury.

by a magistrate can insulate from liability a defendant who never possessed probable cause. *See Garmon*, 878 F.2d at 1408. In this case, the Court has determined that the investigating officers had at least arguable probable cause to arrest Plaintiff, and therefore *Garmon* is not directly applicable.

In addition, the *Garmon* court relied in part on the fact that the *face* of the arrest warrant did not exhibit probable cause. *Id.* The court noted that "[i]f the warrant stated that its issuance was based on probable cause *shown* . . . we might presume that oral testimony was presented which supported the magistrate's determination." *Id.* at 1409 n.1 (emphasis added). In this case, unlike *Garmon*, the affidavit accompanying Plaintiff's arrest warrant indicates that the magistrate issued the warrant "[f]or sufficient cause made known to me in the above affidavit . . . *and other sworn testimony*.") (Pl.'s Ex. 33 to Walls Dep., Arrest Warrants (emphasis added).) The present record therefore demonstrates that the magistrate relied not only on the affidavit, but also on Walls's sworn testimony to determine whether probable cause existed, and Plaintiff has directed the Court to no evidence to the contrary. Because Plaintiff has failed to rebut the record evidence indicating that the magistrate conducted an independent and neutral evaluation of probable cause, she cannot meet her burden of showing that

qualified immunity is inappropriate.[19]  *See Vinyard*, 311 F.3d at 1346 (placing burden of showing that qualified immunity is inappropriate on plaintiff, who must demonstrate that her allegations establish a constitutional violation).

In sum, the Court finds that (1) Walls and Dellinger's investigation was adequate to support their probable cause determination; (2) Walls submitted a constitutionally sufficient affidavit supporting the warrant to arrest Plaintiff for theft by taking; and (3) Plaintiff's arrest was supported by at least arguable probable cause that Plaintiff had committed the offense for which she was arrested.  Plaintiff has therefore failed to show that the actions of Walls and Dellinger violated her constitutionally protected rights.  Accordingly, the Court finds that Walls and Dellinger are entitled to qualified immunity on Plaintiff's § 1983 claims.

B.    Defendant Shetterley: Qualified Immunity

Plaintiff also brings § 1983 claims for false arrest and malicious prosecution against Shetterley, alleging that Shetterley's acts and omissions resulted in Plaintiff's arrest.  Shetterley seeks qualified immunity.  Unlike Walls and Dellinger, the Court concludes that genuine issues of material fact exist as to whether Shetterley is entitled to qualified immunity on Plaintiff's claims.

1.    *Discretionary Function*

---

[19]As to Plaintiff's contention that the arrest warrant did not provide sufficient evidence of Plaintiff's intent, see *supra* note 13.

Plaintiff first contends that Shetterley should not be permitted to assert a qualified immunity defense as a matter of law because she was not engaged in a discretionary function when she affirmatively misled police and withheld potentially exculpatory information from them.  Whether a government official is engaged in a "discretionary function" is a two-part inquiry: first, the Court must "ascertain[] whether the defendant was pursuing a job-related goal," and then the Court must "examine whether the type of action in which she was engaging to further this goal was authorized." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1282 (11th Cir. 2004).  "In applying each prong of [the discretionary function] test, [the courts must] look to the general nature of the defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Id.* at 1266.  For example, in assessing whether a defendant has committed a Fourth Amendment violation, the courts "do not ask whether he has the right to engage in *unconstitutional* searches and seizures, but whether engaging in searches and seizures *in general* is a part of his job-related powers and responsibilities." *Id.*

As to the first prong of the discretionary function test, the Court must determine whether Shetterley was "performing a function that, *but for* the alleged constitutional infirmity, would have fallen

38

within [her] legitimate job description." *Id.* The Court must then determine whether Shetterley was "executing that job-related function-that is, pursuing [her] job-related goals-in an authorized manner." *Id.* The record reflects that it was Shetterley's ultimate responsibility to oversee the ACET grant, which included maintaining an accurate accounting of ACET property. (*See, e.g.*, Schramski Dep. 20:3-11; 22:17-22; 23:2-7.) It follows that Shetterley was executing a job-related function by attempting to locate ACET property for which she retained responsibility. Furthermore, Shetterley pursued this job-related function in an appropriate manner by cooperating with the police investigation. These functions are within the scope of Shetterley's ordinary authority as Principal Investigator. *See, e.g., Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (finding that the defendant acted within his discretionary authority not because his duties included submitting *illegal* probable cause affidavits, but because his authority encompassed submitting probable cause affidavits *in general*). By this standard, Shetterley has met her burden of establishing that she was engaged in a discretionary function when the alleged constitutional violation occurred.

### 2. Violation of a Constitutional Right

Because Shetterley has established that she was engaged in a discretionary function, the burden shifts to Plaintiff to show that Shetterley violated Plaintiff's constitutionally-protected rights. *See Vinyard*, 311 F.3d at 1346-47. Plaintiff alleges that Shetterley

39

violated Plaintiff's clearly established Fourth Amendment rights to be free from false arrest and/or malicious prosecution.

The Eleventh Circuit recognizes § 1983 claims based on false arrest. *See, e.g., Kingsland*, 382 F.3d at 1226. The Eleventh Circuit has also recognized a "federally guaranteed right to be free of malicious prosecution." *Strength v. Hubert*, 854 F.2d 421, 426 (11th Cir. 1988), *overruled in part by Albright v. Oliver*, 510 U.S. 266, 275 (1994) (plurality opinion) (holding that a § 1983 claim for malicious prosecution cannot be based on a violation of substantive due process, but leaving open the question whether such a claim could be based on a Fourth Amendment violation). However, the Eleventh Circuit has also found that when a § 1983 plaintiff is arrested pursuant to a warrant, the claim is most analogous to a § 1983 malicious prosecution claim. *Whiting v. Traylor*, 85 F.3d 581, 585 (11th Cir. 1996); *Kelly*, 21 F.3d at 1553-54; *accord Calero-Colon v. Betancourt-Lebron*, 68 F.3d 1, 4 (1st Cir. 1995) ("The critical inquiry that distinguishes malicious prosecution from false arrest . . . is whether the arrests were made pursuant to a warrant.").

It is clear that there is no substantive due process right to be free from malicious prosecution. *See Albright*, 510 U.S. at 275. Rather, a § 1983 claim for malicious prosecution "is a shorthand way of describing a kind of legitimate section 1983 claim . . . where the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained in violation of the Fourth

40

Amendment and injuries, due to that seizure, follow as the prosecution goes ahead." *Whiting*, 85 F.3d at 584. Thus, "[t]o establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable *seizures* in addition to the elements of the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). The Court addresses these requirements in inverse order.

i.   ELEMENTS OF MALICIOUS PROSECUTION

The requisite elements of the common law tort of malicious prosecution under Georgia and federal law are: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Wood*, 323 F.3d at 882; *accord Kjellsen v. Mills*, 517 F.3d 1232, 1237 (2008). "[A]lthough both state law and federal law help inform the elements of the common law tort of malicious prosecution, a Fourth Amendment malicious prosecution claim under § 1983 remains a federal constitutional claim, and its elements and whether they are met ultimately are controlled by federal law." *Wood*, 323 F.3d at 882; *accord Kjellsen*, 517 F.3d at 1237. After analyzing applicable federal and state law, the Court finds that Defendant Shetterley is not entitled to summary judgment in this case because genuine issues

41

of material fact exist as to each element of Plaintiff's § 1983 cause

of action for malicious prosecution.[20]

First, the evidence in the present record is sufficient to

create genuine issues of material fact as to whether Shetterley's

allegedly false statements resulted in the instigation or

continuation of Plaintiff's prosecution.  The Court's analysis of

this element is informed by Georgia law.  *Wood*, 323 F.3d at 881-82.

_____

[20]Defendants argue only that Plaintiff has failed to prove that Defendants instituted or continued the prosecution against Plaintiff and that Plaintiff has not shown that Defendants acted with malice and without probable cause.  It also appears that Plaintiff has produced sufficient evidence to create genuine issues of material fact as to the remaining elements of her malicious prosecution claim against Shetterley.

There is no real dispute that the allegedly malicious prosecution resulted in some damage to Plaintiff.  Moreover, the only record evidence available indicates that the prosecution terminated in Plaintiff's favor.  The U.S. Supreme Court has described the purpose of the favorable termination requirement as "prevent[ing] parallel litigation over the issues of probable cause and guilt and the possible creation of conflicting resolutions arising out of the same or identical transactions."  *Uboh v. Reno*, 141 F.3d 1000, 1004 (11th Cir. 1998) (citing *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)).  "Courts have further reasoned that only terminations that indicate that the accused is innocent ought to be considered favorable."  *Id.* (internal quotation marks and citation omitted).  Accordingly, when the withdrawal of criminal charges occurs pursuant to a plea or compromise, such withdrawal is not "favorable" and does not support a claim for malicious prosecution.  *Id.*  When no record evidence suggests that such a plea or compromise instigated the withdrawal of charges, however, and when it appears "reasonable to interpret the prosecutor's decision to not pursue . . . charges as consistent with (though perhaps not dispositive proof of) a finding of innocence," a unilateral dismissal of charges may be considered "favorable" for malicious prosecution purposes.  *Id.* at 1005.

In July of 2005, Plaintiff received a letter from the Gwinnett County District Attorney's Office informing her that the office "will not prosecute the above charge(s) at this time."  (Ex. H to Pl.'s Decl.)  Although this letter does not indicate why the district attorney's office decided to terminate the case, there is no record evidence that the office attempted to reinstate any of the charges in the nearly three years since the charges were dropped.  Based on the present record, the Court finds that it is "reasonable to interpret the prosecutor's decision not to pursue . . . charges as consistent with . . . a finding of innocence."  *See Uboh*, 141 F.3d at 1005.

In Georgia, there is "a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute." *Ginn v. Citizens and S. Nat'l Bank*, 145 Ga. App. 175, 178, 243 S.E.2d 528, 530-31 (1978).   Georgia law makes clear, however, "that initiation of the criminal action need not be expressly directed by the party to be held liable." *Id.*, 243 S.E.2d at 531.   Rather,

> [a] distinction must be taken between actually instigating or procuring the institution of criminal proceedings and merely laying information before a law enforcement official without in any way attempting to influence his judgment. Of course, if the informer knew that the facts stated were false, it is clear that he attempted to influence the officer's judgment and he is, therefore, responsible for such subsequent action as may be taken.

*Id.; accord Vojnovic v. Brants*, 272 Ga. App. 475, 478, 612 S.E.2d 621, 625 (2005) (finding sufficient evidence to allow jury to determine whether defendant-employer who allegedly fabricated evidence against plaintiff-employee was liable for malicious prosecution).

Plaintiff contends that Shetterley (1) "affirmatively misrepresented the facts leading up to the closing of the ACET offices"; (2) "made the utterly false assertion that equipment purchased through the ACT grant belonged to Smart Start"; (3) "lied when she stated that [Plaintiff] had no further involvement with ACET after June 30th"; and (4) "lied when she claimed not to know that

43

[Plaintiff] had stored equipment in her home." (Pl.'s Br. in Opp'n to Defs.' Mot. for Summ. J. 28-29.) In addition, Plaintiff contends that Defendant Shetterley "knowingly withheld crucial exculpatory evidence from Walls and Dellinger," including the emails which corroborated Plaintiff's version of the facts and contradicted Shetterley's own statements to the police and her supervisors. (*Id.* at 29.)

There is evidence in the record that Shetterley possessed emails, at least one of which was from a party other than Plaintiff, that directly refuted Shetterley's statements that all leftover equipment was supposed to be sent to either GAYC or Smart Start. (Pl.'s Ex. 5 to Williamson Dep., Email from Brookover to Humphreys.) In addition, ACET Board member Laura Johns stated that she and the other Board members, including Shetterley, knew (1) that there would be excess materials remaining after the move; (2) that the excess materials did not belong to Smart Start because Smart Start was merely a "pass through" agency; and (3) that the materials would be stored with ACET employees, including Plaintiff. (Johns Aff. ¶¶ 9, 13, 16, 17.) Plaintiff also produced documentary evidence indicating that Shetterley knew that Plaintiff continued to assist ACET during the wind-down even after beginning her new job. (*See, e.g.,* Exs. C, D, and G to Pl.'s Decl.; Pl.'s Ex. 51 to Walls Dep.)[21] "A jury could

---

[21]Exhibit C is an email sent to the Board by Plaintiff informing the Board that she had accepted a new job but would be assisting with the ACET transition; Exhibit D is Plaintiff's email log indicating that Plaintiff had work-related contact with Brookover, Friar, and Shetterley after the

conclude from these facts that [Shetterley] knew [her] information was erroneous, that [she] thereby attempted to influence [Walls and Dellinger], and therefore that [she] . . . [is] liable for instigating the prosecution." *Ginn*, 145 Ga. App. at 178, 243 S.E.2d at 531.

In addition, Dellinger admitted that "at least as of the time [he] left [Plaintiff's] house on August 27th, in the absence of whatever information [he] gleaned from Ms. Shetterley, [he] didn't feel [he] had probable cause to issue an arrest warrant[.]" (Dellinger Dep. 136:4-11.)  Walls admitted that the investigation would have been affected had Shetterley provided him with allegedly exculpatory emails.   (*See, e.g.*, Walls Dep. 233:24-234:6.)  The record is clear that Shetterley's allegedly false or misleading statements provided a substantial factual basis for the officers' probable cause determination.   Accordingly, the Court finds that genuine issues of material fact exist as to whether Shetterley's affirmative acts and omissions caused the constitutional violation. *Cf., e.g., Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1218 (11th Cir. 1995) (finding summary judgment appropriate on § 1983 claim against police captain because the plaintiff "failed to offer

---

transition; Exhibit G is a confirmation of Plaintiff's order for supplies to ship the remaining ACET supplies to GAYC.  Exhibit 51 is a series of emails between Plaintiff, Shetterley, Brookover, and Friar indicating, among other things, that Plaintiff wouldn't "mind helping out [with a particular ACET training project] where I can, if you like or need me to." (Pl.'s Ex. 51 to Walls Dep.)

sufficient evidence to present a jury issue on whether [the captain] caused [the arresting officer] to obtain the warrant").

The foregoing evidence is also sufficient to create genuine issues of material fact as to whether Shetterley acted with malice and without probable cause.  "'It is well settled that in an action to recover damages for malicious prosecution where, as here, the evidence is in dispute, the existence or non-existence of malice and want of probable cause are questions of fact for the jury.'" *Kingsland*, 382 F.3d at 1235 (quoting *Good Holding Co. v. Boswell*, 173 F.2d 395, 399 (5th Cir. 1949)).  When viewed in the light most favorable to Plaintiff, the record contains at least some evidence that Shetterley lied to or affirmatively misled Walls and Dellinger. This evidence is sufficient to create a jury question as to lack of probable cause and presence of actual malice.  *See id.* ("[B]ecause [Plaintiff] challenges the legitimacy of the relevant evidence, concerns regarding the fulfillment of the fourth and fifth elements for the common law tort of malicious prosecution are rightly reserved for the jury.")

### ii.  FOURTH AMENDMENT SEIZURE

Plaintiff must also demonstrate that genuine issues of fact exist as to whether "she was seized in relation to the prosecution, in violation of her constitutional rights." *Kingsland*, 382 F.3d at 1235; *accord Wood*, 323 F.3d at 881.  A "surrender to the State's show of authority (that is, [a] voluntary surrender following the issuance

46

of an arrest warrant) [may] constitute[] a seizure for purposes of
the Fourth Amendment." *Whiting*, 85 F.3d at 585 n.6 (internal
quotation marks and citations omitted). The Eleventh Circuit has
made clear that this type of "seizure" may form the basis for a §
1983 claim. *See id.* at 585; *accord Singer v. Fulton County Sheriff*,
63 F.3d 110, 117 (2d Cir. 1995) (holding that a § 1983 plaintiff
alleging malicious prosecution must have been seized pursuant to
legal process; when the "legal process" is in the form of a warrant,
"the arrest itself may constitute the seizure"). It is undisputed
that Plaintiff surrendered when she learned that a warrant had been
sworn out for her arrest. (Pl.'s Decl. ¶ 29.) Again construing the
present record in the light most favorable to Plaintiff, genuine
issues of material fact exist as to whether this seizure was
constitutionally reasonable.

In sum, Plaintiff has produced sufficient evidence to allow a
reasonable finder of fact to conclude that Shetterley's actions
violated Plaintiff's right to be free from malicious prosecutions.
Plaintiff must next demonstrate that the constitutional rights
Shetterley purportedly violated were clearly established. *See
Vinyard*, 311 F.3d at 1346-47.

### 3.   Whether the Right is Clearly Established

If, for purposes of qualified immunity, sufficient evidence
exists that a government official violated a constitutional right,
the Court must then determine whether that right was clearly

established at the time of the violation. *Vinyard*, 311 F.3d at 1349. In doing so, the Court may look to "decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state" for guidance. *Id.* at 1351 n.22. "'The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [official] that [her] conduct was unlawful in the situation [she] confronted.'" *Id.* at 1350 (quoting *Saucier*, 533 U.S. at 202).

The Eleventh Circuit has recognized "a federal right to be free from prosecutions procured by false and misleading information." *Kelly*, 21 F.3d at 1549 (internal quotation marks and citation omitted). Along these lines, this Circuit has held that a government official may be found liable under § 1983 for instigating or causing an unlawful arrest or malicious prosecution. *Cf., e.g.*, *Jordan*, 487 F.3d at 1354 (holding that "[i]n this Circuit, a non-arresting officer who instigates or causes an unlawful arrest can still be liable under the Fourth Amendment"). In addition, "[k]nowingly making false statements to obtain an arrest warrant can lead to a Fourth Amendment violation." *Whiting*, 85 F.3d at 585 n.5 (citing *U.S. v. Martin*, 615 F.2d 318, 327-29 (5th Cir. 1980)); *accord Kalina v. Fletcher*, 522 U.S. 118, 122, 131 (1997) (holding that § 1983 may provide a remedy when a prosecutor acting as a "complaining witness" misrepresents information in a probable cause certification);

48

*Kingsland*, 382 F.2d at 1232 (noting that "falsifying facts to establish probable cause is patently unconstitutional").

Given the foregoing authorities, the Court finds it beyond reasonable dispute that at the time the events of this case took place, providing the police with false or misleading information that results in an arrest may subject a government official to § 1983 liability for false arrest and/or malicious prosecution.[22]  The present record therefore reveals that genuine issues of fact exist as to whether Shetterley violated Plaintiff's clearly established constitutional rights.  If she did so, she would not be entitled to qualified immunity.  Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's claims against Shetterley.[23]

### III. Attorney's Fees

Finally, Plaintiff asserts that she is entitled to attorney's fees pursuant to 42 U.S.C. § 1988, which provides that a "prevailing" party in an action to enforce § 1983 may be awarded such fees.

---

[22]While it is true that most of these cases deal with police officers who provided false information to procure an arrest, the Court finds this situation sufficiently analogous to put Shetterley on notice that her alleged actions also violated clearly established law.  *See, e.g.,* *Vinyard*, 311 F.3d at 1352 (holding that under some circumstances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful" (emphasis, internal quotation marks and citations omitted; alteration in original).

[23]The Court hastens to add that it is not finding as a matter of law that Defendant Shetterley is *not* entitled to qualified immunity.  The Court simply finds that genuine issues of material fact exist as to whether she is so entitled.

Plaintiff is clearly not the "prevailing" party with respect to her claims against Defendants Williamson, Walls, and Dellinger, and therefore Defendants' Motion for Summary Judgment is granted with respect to those claims.  However, because the Court has denied Defendants' motion for summary judgment as to Plaintiff's claims against Shetterley, this claim will proceed to trial.  Because a jury will determine who is the "prevailing" party in this case, Shetterley is not entitled to summary judgment as to attorney's fees at this time.

                              CONCLUSION

     For the reasons stated herein, the Court grants Defendants' Motion for Summary Judgment (Doc. 18) with respect to Defendants Williamson, Walls, and Dellinger.  The Court denies Defendants' Motion for Summary Judgment with respect to Defendant Shetterley.

     Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court directs the Clerk to enter final judgment in favor of Defendants Williamson, Walls and Dellinger, finding that there is no just reason for delaying the entry of final judgment in favor of these Defendants.  The Court also certifies for interlocutory appeal its denial of Defendant Shetterley's motion for summary judgment based upon qualified immunity, finding that the requirements for such certification have been met.

IT IS SO ORDERED, this 12th day of June, 2008.


                                    S/Clay D. Land
                                    CLAY D. LAND
                                UNITED STATES DISTRICT JUDGE